**VOIERS ENTERPRISES, INC., d.b.a. Resthaven Nursing Home, Appellant,**

**v.**

**OHIO CIVIL RIGHTS COMMISSION et al., Appellees.**

[Cite as *Voiers Ent., Inc. v. Ohio Civ. Rights Comm.,*
156 Ohio App.3d 195, 2004-Ohio-738.]

Court of Appeals of Ohio,
Fourth District, Scioto County.

No. 03CA2899.

Decided Feb. 11, 2004.

196

Geoffrey E. Webster and J. Randall Richards, for appellant.

Jim Petro, Attorney General, and Patrick M. Dull, Assistant Attorney General, for appellee Ohio Civil Rights Commission.[1]

---

KLINE, Presiding Judge.

{¶ 1} Voiers Enterprises, Inc., d.b.a. Resthaven Nursing Home ("Resthaven"), appeals from the judgment of the Scioto County Common Pleas Court affirming the decision of the Ohio Civil Rights Commission (the "commission"). Resthaven alleges that the trial court abused its discretion in finding that the record contained reliable, probative, and substantial evidence supporting the commission's decision and that the commission's decision was in accordance with law. Additionally, Resthaven alleges that, due to defects in the commission's conciliation efforts, the commission lacked jurisdiction to file a complaint and proceed with the formal hearing. Because we find that the trial court did not abuse its discretion and that the commission made several attempts at conciliation, we disagree. Accordingly, we affirm the judgment of the trial court.

I

{¶ 2} Resthaven is a skilled and intermediate nursing home in McDermott, Ohio. Deborah Voiers Akers ("Akers") is Resthaven's assistant administrator. Crystal Rigsby ("Rigsby") worked for Resthaven from March 23, 1999, until September 15, 1999. At the time of her termination, Rigsby served as an activity aide two days per week and as a housekeeper two days per week. As an activity aide, Rigsby planned, coordinated, and directed the residents' activity program under the supervision of the activity director. As a housekeeper, she was responsible for performing basic cleaning duties, including sweeping, dusting, and mopping. Rigsby testified that neither of the positions required her to perform any heavy lifting.

---

1. Crystal Rigsby, the complainant in the original proceedings before the Ohio Civil Rights Commission, has not entered an appearance.

{¶ 3} In September 1999, Rigsby suspected that she might be pregnant. On September 14, 1999, she had a doctor confirm her pregnancy. The following day, she returned to work with a doctor's note stating that she could return to work. Rigsby then informed Akers that she was pregnant, at which time, Akers informed her that she could not return to work until she brought in a doctor's note releasing her to work with no restrictions. Akers gave Rigsby 30 days to bring in the doctor's note.

{¶ 4} On September 20, 1999, Rigsby returned to her doctor's office, where a nurse practitioner examined her. Another nurse at the clinic wrote Rigsby a return-to-work note, stating that Rigsby was pregnant, due to deliver on May 11, 2000, and could not lift over 25 pounds. The nurse signed the doctor's name to the note, with a slash and her initials after the doctor's name to indicate that it was not the doctor's signature.

{¶ 5} Rigsby took the note to her employer. On September 23, 1999, she met with Akers and Julie Emmons ("Emmons"), a secretary. Emmons took notes during the meeting, which indicate that Akers told Rigsby that she could not continue working because she had a 25–pound lifting restriction. The notes also reflect that Akers told Rigsby that she was concerned that Rigsby would injure herself or her baby if she tried to catch a falling resident. Additionally, Emmons's notes reflect that Akers told Rigsby that there was no job available for her at Resthaven with a 25–pound lifting restriction, that Resthaven had "nothing" for her, and that Akers was not willing to take the risk or let Rigsby take the risk that she might get hurt while she was pregnant. Emmons's notes do not refer to any alleged insufficiency of the doctor's note Rigsby provided, nor do they mention any statutory or administrative mandate that Rigsby be medically certified to perform her job duties.

{¶ 6} After Akers terminated Rigsby's employment, Rigsby applied for unemployment benefits. Resthaven did not oppose Rigsby's application for unemployment benefits, and even indicated that Rigsby was "discharged" on the applicable Ohio Bureau of Employment Services forms. Rigsby obtained unemployment benefits and continued to apply for positions at other nursing homes and clerk positions at discount stores and carryouts in the area.

{¶ 7} Rigsby gave birth to her daughter on May 10, 2000. Resthaven rehired her as an activity aide on August 10, 2000. She worked two days per week at a lower rate of pay, and quit on December 26, 2000. Subsequently, Rigsby's father hired her to work in his store 30 hours per week, at $6.00 per hour.

{¶ 8} After Resthaven terminated Rigsby's employment, Rigsby filed a complaint with the commission, alleging that Resthaven unlawfully discriminated against her based upon her sex by terminating her employment due to her pregnancy. The commission conducted an investigation and determined that it

was probable that Resthaven had engaged in unlawful discrimination practices. The commission sent Resthaven a conciliation agreement and consent order, which Resthaven rejected. The commission also invited Resthaven to a conciliation meeting, which Resthaven objected to on the ground that Rigsby was not present. While Resthaven did make a settlement offer at the meeting, it revoked the offer the same day, before the commission had the opportunity to present it to Rigsby.

{¶ 9} Accordingly, the commission served Resthaven with a notice of failure to conciliate and proceeded to issue a complaint and conduct a hearing on the matter. After a full hearing, the hearing examiner issued findings of fact, conclusions of law, and recommendations to the commission, wherein the hearing examiner found that Resthaven unlawfully discriminated against Rigsby due to her pregnancy in violation of R.C. 4112.02(A). The hearing examiner recommended that the commission issue a cease-and-desist order against Resthaven; order Resthaven to make an offer of employment to Rigsby, reinstating her to her former position or an equivalent position, at a rate of pay equal to what she would have been earning had she remained continuously in Resthaven's employ; and pay Rigsby an appropriate amount of back pay.

{¶ 10} The commission adopted the hearing examiner's report at its public meeting on March 14, 2002, and incorporated the hearing examiner's report in its entirety. Thereafter, Resthaven appealed from the commission's final order to the Scioto County Court of Common Pleas pursuant to R.C. 4112.06. The trial court determined that there was reliable, probative, and substantial evidence in the record to support the commission's final order. Accordingly, the trial court affirmed the commission's final order.

{¶ 11} Voiers now appeals, raising one assignment of error: "The lower court abused its discretion in finding that the decision of the Ohio Civil Rights Commission was supported by reliable, probative and substantial evidence and is in accordance with the law."

## II

{¶ 12} We first set forth the standard of review for appeals from the Ohio Civil Rights Commission. The court of common pleas must affirm the commission's decision if the court finds that there is reliable, probative, and substantial evidence in the record to support the decision. R.C. 4112.06(E); *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 20 O.O.3d 200, 421 N.E.2d 128, paragraph two of the syllabus. The court must give due deference to the commission's resolution of evidentiary conflicts because the commission has the opportunity to observe the demeanor of the witnesses and weigh their credibility. *Univ. of*

*Cincinnati v. Conrad* (1980), 63 Ohio St.2d 108, 111, 17 O.O.3d 65, 407 N.E.2d 1265. However, the court may reverse the commission's judgment where the commission's determination rests upon inferences improperly drawn from the evidence adduced. Id., 63 Ohio St.3d at 111–112, 585 N.E.2d 396.

{¶ 13} Our review of the trial court's judgment is more limited. We may reverse a determination of the court of common pleas only upon a showing that the court of common pleas abused its discretion. *Ohio Civ. Rights Comm. v. Case W. Res. Univ.* (1996), 76 Ohio St.3d 168, 177, 666 N.E.2d 1376, citing *Cleveland Civ. Serv. Comm. v. Ohio Civ. Rights Comm.* (1991), 57 Ohio St.3d 62, 65, 565 N.E.2d 579. See, also, *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 260–261, 533 N.E.2d 264. Accordingly, while the standard of review for the court of common pleas is whether the record contains reliable, probative, and substantial evidence to support the commission's decision, this court's standard of review is whether the court of common pleas abused its discretion. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140, citing *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 14} Resthaven first argues that its compliance with Ohio Adm.Code 3701–17–07(D) constitutes a legitimate, nondiscriminatory reason for its conduct in terminating Rigsby. Specifically, Resthaven claims that Ohio Adm.Code 3701–17–07(D) requires nursing homes to maintain ongoing physician certification that its employees are free of tuberculosis and are medically capable of performing their duties. Resthaven also argues that the trial court abused its discretion by finding that lifting was not a requirement of Rigsby's job, and that it treated Rigsby no differently than it treated any other pregnant or nonpregnant employee who was unable to perform her job duties. Because Rigsby's actual job duties are relevant to the determination of whether she was medically capable of performing her job during her pregnancy and whether she was treated the same as other similarly situated employees, we discuss these arguments together.

{¶ 15} Ohio Adm.Code 3701–17–07(D) provides: "Except as provided in paragraph (D)(3) of this rule, no individual shall work in a nursing home in any capacity for ten or more hours in any thirty-day period unless the individual: * * * (2) Has been examined within thirty days before commencing work, or on the first day of work, by a physician or other licensed health professional acting within their applicable scope of practice and certified as medically capable of performing his or her prescribed duties." Thus, pursuant to the plain language of the administrative rule cited by Resthaven, a nursing home must have

physician certification of an employee's medical capability to perform his or her job duties only at the time the employee commences employment. If the drafters of the Administrative Code intended for nursing homes to have an ongoing duty to medically certify their employees' capabilities, they could have plainly stated such a requirement.

{¶ 16} Resthaven further argues that its interpretation of Ohio Adm.Code 3701–17–07(D) constitutes legislatively permissible discrimination to protect the employee, other employees, or the public from a significantly increased risk of occupational hazards. R.C. 4112.02(L) provides: "Nothing in divisions (A) to (E) of this section shall be construed to require a person with a disability to be employed * * * under circumstances that would significantly increase the occupational hazards affecting either the person with a disability, other employees, the general public, or the facilities in which the work is to be performed * * *."

{¶ 17} Here, Resthaven claims that Rigsby's pregnancy and the resultant 25–pound lifting restriction significantly increase the occupational hazards affecting Rigsby, her baby, and Resthaven residents. Resthaven further claims that Rigsby admitted that her position included "patient care on the floor, lifting, bathing, changing, dressing * * *." However, our review of the hearing transcript reveals that Rigsby testified that those duties were those of a certified nurse's aide ("CNA"). Rigsby testified that, although she did not have the requisite certification, she worked as a CNA when she was first hired by Resthaven. Subsequently, she assumed the positions of activity aide and housekeeper.

{¶ 18} Rigsby testified that, although the official job description for the activity aide position specified that aides have no weight-lifting restriction, she was neither required, nor permitted, to lift patients or residents. This testimony was further supported by the document Resthaven had Rigsby sign, wherein she acknowledged that she was not to lift residents without assistance. Rigsby also testified that her position as an activity aide required no lifting. Additionally, Rigsby's testimony reflected that her housekeeping duties did not involve lifting, as she was able to scoot the furniture in order to clean under it. Thus, there was reliable, probative, and substantial evidence in the record demonstrating that Rigsby's pregnancy and attendant lifting restriction did not present a significantly increased risk of occupational hazards to Rigsby, her coworkers, or Resthaven's residents.

{¶ 19} In addition to Rigsby's testimony regarding the lack of lifting in her daily job duties, the commission submitted Resthaven's revised job description for the position of activity aide. The November 2000 job description remained identical to that in effect at the time of Rigsby's termination, except that Resthaven removed the requirement that an activity aide "must have no weight

lifting limitations." The trial court reasonably concluded that the revised job description combined with Rigsby's testimony that the job did not require lifting constituted reliable, probative, and substantial evidence in the record to support the commission's conclusion that lifting was not a bona fide occupational qualification for an activity aide at Resthaven at the time of Rigsby's discharge.

{¶ 20} Resthaven argues that it did not discriminate against Rigsby due to her pregnancy based upon its treatment of other pregnant and nonpregnant employees. Resthaven contends that other employees were permitted to continue working as long as they wanted with a doctor's certification, were permitted to take leave, and were immediately reinstated when they wished to return to work. Only one of the examples cited by Resthaven involved an employee with a lifting restriction. Resthaven notes that, in that case, it permitted the employee to continue working because "her position did not require lifting."

{¶ 21} Similarly, the commission found that despite the language in Rigsby's job description requiring "no weight lifting limitations," her actual job duties required no heavy lifting. We have already found that the trial court reasonably concluded that there was reliable, probative, and substantial evidence in the record to support the commission's finding that lifting was not a part of Rigsby's actual job duties. Accordingly, there is reliable, probative, and substantial evidence in the record to demonstrate that Resthaven did treat Rigsby differently than it treated other similarly situated employees.

{¶ 22} Further, the trial court noted that the notes taken by Emmons during the September meeting state the reasons why Resthaven terminated Rigsby's employment. The notes reflect that Akers told Rigsby that she was concerned that Rigsby would injure herself or her baby if she tried to catch a falling resident. Emmons's notes reflect that Akers also told Rigsby that there was no job available for her at Resthaven with a 25–pound lifting restriction, that Resthaven had "nothing" for her, and that Akers was not willing to take the risk or let Rigsby take the risk that she might get hurt while she was pregnant.

{¶ 23} Emmons's notes specify the reasons Resthaven discharged Rigsby. They do not refer to any alleged insufficiency of the doctor's note Rigsby provided, nor do they mention any statutory or administrative mandate that Rigsby be medically certified to perform her job duties. Further, Emmons's notes do not refer to any discussion that Resthaven would place Rigsby on an unpaid leave of absence during her pregnancy, as Resthaven claims it has done with other pregnant and nonpregnant employees. Hence, the trial court did not err in concluding that there was reliable, probative, and substantial evidence to support the commission's conclusion that Resthaven terminated Rigsby because of her pregnancy, and, therefore, treated her differently from other employees.

{¶ 24} Accordingly, we find that the trial court did not abuse its discretion in affirming the commission's finding that Rigsby's job did not require heavy lifting and that Resthaven treated Rigsby differently from other pregnant or temporarily disabled employees. Nor did the trial court abuse its discretion in upholding the commission's finding that Resthaven's alleged efforts to comply with Ohio Adm.Code 3701–17–07(D) and R.C. 4112.02(L) did not constitute legislatively permissible discrimination under the circumstances, and that Resthaven's alleged need to comply with these sections was merely a pretext for Rigsby's discharge.

## III

{¶ 25} In its final issue presented for review, Resthaven argues that the commission lacked jurisdiction to file a complaint and proceed with a formal hearing because it failed to offer any type of material conciliation to Resthaven as required by R.C. 4112.05(B). Whether the commission had jurisdiction to conduct a formal hearing is a question of law that we review de novo, without any deference to the trial court's determination. *McClure v. McClure* (1997), 119 Ohio App.3d 76, 79, 694 N.E.2d 515, citing *Burns v. Daily* (1996), 114 Ohio App.3d 693, 702, 683 N.E.2d 1164.

{¶ 26} R.C. 4112.05(B)(4) provides: "If the commission determines after a preliminary investigation * * * that it is probable that an unlawful discriminatory practice has been or is being engaged in, *it shall endeavor to eliminate the practice* by informal methods of conference, conciliation, and persuasion." (Emphasis added.) The Ohio Supreme Court has held that a completed and unsuccessful attempt by the commission to eliminate unlawful discriminatory practices by conference, conciliation, or persuasion is a jurisdictional prerequisite to the issuance of a complaint by the commission. *State ex rel. Republic Steel Corp. v. Ohio Civ. Rights Comm.* (1975), 44 Ohio St.2d 178, 184, 73 O.O.2d 478, 339 N.E.2d 658.[2]

{¶ 27} Here, the record reflects that the commission attempted conciliation by mailing a proposed conciliation agreement and consent order to Resthaven's counsel on January 4, 2001, and inviting counsel to schedule a conciliation meeting with the appointed conciliator. The record further reflects that on January 16, 2001, Resthaven's counsel spoke with the conciliator via telephone and rejected the conciliation agreement and consent order approved by the commission.

---

2. *Republic Steel* involved an interpretation of former R.C. 4112.05(B). However, current R.C. 4112.05(B)(4) is substantially similar to the former section. *Genaro v. Cent. Transport, Inc.* (1999), 84 Ohio St.3d 293, 298, 703 N.E.2d 782, fn. 3.

{¶ 28} The commission then scheduled a conciliation meeting for January 25, 2001. The record reflects that Resthaven's counsel and Akers appeared at the meeting, and counsel made a settlement proposal. However, Resthaven's counsel objected to the conciliation meeting in that Rigsby was not present or invited. When Akers and Resthaven's counsel were ready to leave the meeting, Akers testified that counsel rescinded Resthaven's settlement proposal. After the meeting adjourned, Resthaven's counsel sent a letter to the conciliator, again voicing his objection that Rigsby was not present at the meeting and questioning how a conciliation meeting could be productive without the presence of the complaining party. Additionally, counsel's letter reiterated his earlier rescission of the settlement proposal.

{¶ 29} On January 31, 2001, the commission sent Resthaven's counsel a letter, noting Resthaven's rejection of the conciliation agreement and consent order approved by the commission, as well as Resthaven's settlement proposal and rapid rescission of same. The letter further stated, "[a]s a result, I am serving this *Notice of Failure to Conciliate*. I am required to report this Failure of Conciliation to the Commission seven (7) days after the mailing of this notice. Any offers of settlement must be made before the expiration of these seven (7) days." However, the record contains no evidence that Resthaven took this opportunity to prevent the conciliator from reporting the failure of conciliation to the commission.

{¶ 30} We note that pursuant to R.C. 4112.05(B)(4), once the commission's investigation has determined that it is probable that an unlawful discriminatory practice has been or is being engaged in, the statute requires the commission to utilize the methods of conference, conciliation, and persuasion to *"endeavor to eliminate the practice."* Therefore, the primary focus of the conciliation proceedings is to eliminate the alleged discriminatory practice, not necessarily to settle the existing dispute between the complainant and the respondent. Hence, the complainant's presence at the conciliation meeting is neither necessary nor statutorily mandated.

{¶ 31} The record clearly reflects that the commission made three attempts at conciliation, including (1) the submission of a proposed conciliation agreement and consent order; (2) scheduling a conciliation meeting; and (3) offering Resthaven the opportunity to make another settlement proposal within seven days of the notice of failure to conciliate. Resthaven rejected the proposed conciliation agreement and consent order. Resthaven's representative and counsel attended the conciliation meeting, made a settlement proposal, objected to the complainant's absence, and promptly withdrew the settlement proposal. The record contains no evidence tending to demonstrate that Resthaven attempted to reopen settlement dialogue after its receipt of the notice of failure to conciliate. Based

upon the foregoing, we find that the commission attempted to conciliate this matter in accordance with R.C. 4112.05(B)(4), but its conciliation efforts failed. Accordingly, we find that the commission satisfied the jurisdictional prerequisite of R.C. 4112.05(B)(4) and therefore had jurisdiction to file its complaint and proceed with the formal hearing.

## IV

{¶ 32} In conclusion, we find that the trial court did not abuse its discretion in finding that the record contained reliable, probative, and substantial evidence to support the commission's decision. We also find that the commission's attempts at conciliation failed before the filing of the commission's complaint, thus satisfying the jurisdictional prerequisite of R.C. 4112.05(B)(4). Accordingly, we overrule Resthaven's sole assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

PETER B. ABELE, J., concurs.

HARSHA, J., concurs in judgment only.